

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-77,085

### KRISTOPHER LOVE, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. F15-76400-W
### IN THE 363RD JUDICIAL DISTRICT COURT
### DALLAS COUNTY

**KEEL, J., delivered the opinion for a unanimous court.**

## O P I N I O N

A jury convicted Appellant of capital murder committed on September 2, 2015,

for intentionally killing another in the course of committing or attempting to commit

robbery. *See* Tex. Penal Code § 19.03(a)(2). Pursuant to the jury's answers to the special

issues set forth in Texas Code of Criminal Procedure Article 37.071 sections 2(b) and 2(e), the trial court sentenced Appellant to death. Tex. Code Crim. P. art. 37.071, § 2(g). Direct appeal to this Court is automatic. *Id.* art. 37.071, § 2(h). Appellant raises forty-six points of error. After reviewing Appellant's points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

Throughout the remainder of this opinion, "Article" refers to the Code of Criminal Procedure, and "Section" refers to the Penal Code. Except where otherwise noted, all dates refer to the year 2015.

## I. Overview

Brenda Delgado was obsessed with her ex-boyfriend, Dr. Ricardo "Ricky" Paniagua, and his new girlfriend, Dr. Kendra Hatcher. Delgado offered to pay Appellant and Crystal Cortes for their help in murdering Hatcher, and they accepted her offer. After several meetings and phone conversations, they decided to make the murder look like a robbery gone wrong. They followed Hatcher and learned how to get into her apartment building's garage, and Appellant got a gun.

On September 2, Delgado went to a restaurant to create an alibi for herself while Cortes and Appellant waited in Hatcher's apartment building's garage in a borrowed Jeep. When Hatcher parked, Appellant got out of the Jeep and shot her to death and took some of her property, and then Cortes and Appellant fled the scene.

## II. Sufficiency Challenges

Appellant raises several challenges to the sufficiency of the evidence at the guilt and punishment stages of trial.

**II.A.  Factual Sufficiency Challenges**

In points of error twenty-five and thirty-five Appellant challenges the factual sufficiency of the evidence to prove his guilt and to support the jury's answer to the future-dangerousness issue.  We overrule these points of error because we do not review the factual sufficiency of the evidence to support a defendant's conviction or a future dangerousness finding.  *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (guilt); *Williams v. State*, 270 S.W.3d 112, 138 (Tex. Crim. App. 2008) (future dangerousness).

In point of error thirty-seven, Appellant claims he was "denied due process of law" by our prior holdings that the jury's answer to the mitigation special issue is not reviewable on appeal.  In point of error thirty-eight, he claims that the jury's verdict on the mitigation issue was "against the great weight and preponderance of the evidence." From his argument, we understand Appellant to:  (1) ask the Court to review the factual sufficiency of the jury's negative answer to the mitigation special issue; and (2) assert that a failure to do so renders the mitigation special issue unconstitutional because it denies him meaningful appellate review.  But the mitigation special issue is not amenable to a sufficiency review.  *See Prystash v. State*, 3 S.W.3d. 522, 536 (Tex. Crim. App. 1999).  That does not deprive an appellant of a constitutionally meaningful appellate review.  *See, e.g., id.*  Points of error thirty-seven and thirty-eight are overruled.

**II.B.  Accomplice-Witness Corroboration**

In point of error twenty-four, Appellant claims that the evidence is legally insufficient to corroborate Cortes's accomplice-witness testimony under Article 38.14. Appellant refers to the *Jackson v. Virginia* constitutional standard for legal sufficiency, *see* 443 U.S. 307, 319 (1979), but he does not apply it to his case.  Instead, he challenges Cortes's credibility and the sufficiency of the evidence corroborating her testimony under Article 38.14.  We interpret this point of error as an argument that the evidence was legally insufficient to corroborate Cortes's testimony as required by Article 38.14.  To the extent Appellant intends to challenge the legal sufficiency of the evidence under the *Jackson* standard, that challenge is inadequately briefed.  *See* Tex. R. App. P. 38.1.

Article 38.14 provides:  "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."  In reviewing the sufficiency of corroborating evidence under Article 38.14, we "eliminate from consideration the accomplice testimony and then examine the other inculpatory evidence to ascertain whether the remaining evidence tends to connect the defendant with the offense." *McDuff v. State*, 939 S.W.2d 607, 612 (Tex. Crim. App. 1997).  The non-accomplice evidence need not be sufficient by itself to support a conviction. *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). Further, "a defendant's presence at the scene and participation in the underlying offense

[may] be sufficient to connect him to the capital murder for accomplice-witness rule purposes." *Solomon v. State*, 49 S.W.3d 356, 362 (Tex. Crim. App. 2001).

**II.B.1.  Guilt–Innocence Evidence**

Hatcher was killed in her apartment building's garage on September 2.  Hashem Saad, a resident of the building, testified that on that evening he exited the elevator onto the lowest level of the complex's parking garage and heard animal-like screaming and one or two gunshots.  He then heard a car door close and tires screech.  Saad ran to his Corvette and got inside.  He saw a Jeep Cherokee speed down the ramp from the parking level above, make a left, and pass behind his car.  Saad backed out of his parking place and drove up the ramp toward the garage's exit.  Meanwhile, the Jeep turned around on the lower level where Saad had been parked, came up the ramp, and followed him out of the garage.  While Saad was driving up the ramp, he saw a woman lying on the floor of the garage.  She appeared to have been shot.  Saad called 9-1-1.

Security camera footage corroborated Saad's testimony.  A dark-colored Jeep Cherokee entered the garage's unsecured visitor area at 7:13 p.m. and waited there until 7:17 p.m. when it followed another vehicle through the gate and parked in the secured area of the garage.  At about 7:42 p.m. Hatcher drove a white car into the garage's secured area and parked on the last row.  A person wearing black immediately exited the Jeep and walked down the ramp toward Hatcher's car.  Moments later, the Jeep's lights came on and began backing out of its parking spot.  The person wearing black walked

back up the ramp and got into the Jeep which then drove down the ramp to the garage's lower level. At 7:44 p.m., a silver Corvette exited the garage, followed by the Jeep.

First responders found Hatcher lying under the open driver's side door of her white Toyota Camry and blood on the floor. She had suffered trauma to her chin, and they found a wound to the back of her head. A pistol magazine and a fired bullet fragment were on the ground beside Hatcher's body. A fired cartridge case was on her car's passenger side floorboard.

The medical examiner testified that Hatcher sustained a gunshot wound to the back of her head with an exit wound under her chin. The bullet had traveled from back to front and downward. Hatcher also had an abrasion on her chest, which suggested that her chin was down and near her chest when she was shot. The bullet severed her spinal cord, leaving her unable to breathe and causing death quickly.

A trace evidence examiner testified that gunshot residue collected from the back of Hatcher's hands was consistent with her hands having been raised and behind her head when she was shot.

Cortes, who testified pursuant to a plea deal, said that she and Delgado had already begun planning the murder when they met Appellant through a close friend of Cortes's brother at the end of August. They all met at the Mandalay Apartments, where Appellant lived, and Delgado and Cortes explained their intention to murder Hatcher. Appellant agreed to participate. They met between ten and fifteen times to plan Hatcher's murder

and communicated frequently by phone. They followed Hatcher in different cars, including on at least one occasion Appellant's blue Chrysler Sebring.

After discussing several potential plans, they ultimately agreed to kill Hatcher with a gun and make the offense look like a "robbery gone bad." Appellant suggested that Cortes drive because she was more familiar with the area, and he volunteered to shoot Hatcher and take her property. Appellant thereafter obtained a .40-caliber Smith & Wesson pistol to use in the murder. At Cortes's suggestion, Appellant wore gloves when he handled and loaded the pistol. Delgado promised to pay Cortes $500 for driving and promised to pay Appellant in drugs and money for shooting Hatcher.

Cortes testified that on the morning of September 2 she and Delgado picked up Appellant at his apartment and stopped at a convenience store so that Appellant could buy a black shirt. They then dropped Appellant off at a Jack in the Box while Delgado and Cortes drove to a mechanic shop owned by Delgado's friend, Jose Luis Ortiz. Delgado led Ortiz to believe that her BMW needed work, and he let her borrow his black Jeep Cherokee while he checked out her car. After leaving Ortiz's shop in his Jeep, Delgado and Cortes picked up Appellant, returned to the Mandalay Apartments, and put stolen paper tags on the Jeep.

At about 11:45 a.m., Cortes and Appellant drove the Jeep to Hatcher's apartment complex, planning to follow her. They saw her pull out of the garage and anticipated that she was going to her dental office but did not find her there. Cortes then drove them back

to the Mandalay Apartments and left Appellant there while she picked up her son from school, took him to Sonic, and dropped him off at her grandmother's house.

Cortes picked Appellant up from his apartment again at 4:30 p.m. They initially went to the dental office but then returned to Hatcher's apartment complex. Cortes was driving and Appellant was lying down in the back seat so that no one could see him. Cortes pulled into the garage's visitor section and waited for a vehicle to enter the secured area so that they could follow it through the gate, a strategy they had used several times before. The area where Hatcher usually parked was full, so they parked on the last row.

After thirty minutes to an hour, they saw Hatcher enter the garage in her white Toyota Camry. Appellant put on gloves, grabbed the pistol, and exited the Jeep. Cortes testified that she heard Hatcher scream and then heard gunshots. Cortes backed out of the parking spot, and Appellant got back in the Jeep with Hatcher's purse, a camera, and the pistol. Cortes drove down the ramp by mistake and then turned the Jeep around and came back up to leave through the main entrance. As they drove up the ramp, she saw Hatcher's body lying on the floor of the garage.

Cortes and Appellant went to an abandoned house in Pleasant Grove, cleaned the Jeep with disinfectant, and removed the paper tags. Cortes dropped Appellant off at the Mandalay Apartments and then picked up her son at her grandmother's house. Cortes testified that Appellant kept the pistol he had used to shoot Hatcher.

Cortes testified that Delgado called her between 8:00 and 9:00 p.m. using Ortiz's cell phone and asked whether "the task"—meaning the murder—"was complete." Cortes said that it was. Delgado, who was having dinner out with Ortiz, sent Ortiz's home address to Cortes so that they could meet there to return his Jeep and pick up the BMW.

Cortes and her son got to Ortiz's house before Delgado and Ortiz did. She retrieved from the back of the Jeep the shirt and gloves that Appellant had worn, the hoodie that she had worn, the paper tags, and Hatcher's purse. Moments later Delgado and Ortiz arrived in the BMW. They exchanged cars, and Ortiz drove away in his Jeep. Security-camera footage corroborated Cortes's account of this exchange.

Delgado and Cortes then exchanged the BMW for Delgado's Lexus at a parking garage and went to Cortes's grandmother's house where they burned the clothing, paper tags, and contents of Hatcher's purse. Delgado paid Cortes $500 for driving Appellant to murder Hatcher. The next day, Delgado paid Appellant with "Kush," cocaine, and the cash from Hatcher's wallet.

Dallas Police Department Detective Eric Barnes, the lead investigator, testified that a black Jeep Cherokee was a vehicle of interest based on Saad's 9-1-1 call. After a still image of the Jeep was released in connection with the offense, Ortiz contacted the police and claimed ownership of it. He recognized it from its distinctive rims, hood damage, and missing bumper cap. Ortiz told the police that he had loaned the Jeep to Delgado on the day of the offense, and he consented to a vehicle and cell phone search.

A crime scene analyst who processed the Jeep testified that he found a Sonic receipt for September 2 at 3:53 p.m. in the center console area.

Investigators questioned Delgado on September 4, but she denied having driven the Jeep, asserting that Cortes had used it on the day of the offense. After the interview Delgado fled to Mexico.

Barnes questioned Cortes on September 4. After being confronted with evidence that contradicted her initial statement, she eventually admitted that she had driven the Jeep during the killing. She was arrested and charged with capital murder. In a later interview, Cortes identified the shooter as a man named "Kris." She described him and his blue Chrysler Sebring bearing Tennessee license plates and identified the area of town where he lived or was known to frequent.

Retired DPD detective James Thompson testified that investigators used Cortes's phone to identify a Metro PCS number that they believed belonged to the shooter. Other testimony showed that Metro PCS only sells prepaid accounts, does not do credit checks, and does not verify its subscribers' identification information. The subscriber in this case provided the name "Kasino Jackson" and listed his address as 7272 Marvin D. Love Freeway, Dallas, Texas. This address corresponded to an area of South Dallas that Appellant was known to frequent.

Police got a warrant to "ping" the Metro PCS number and determine its location. On October 1 the phone was in an apartment complex in South Dallas, in the same area where Cortes claimed the shooter lived or frequented. Thompson went to the apartment

complex and looked for a blue Chrysler Sebring. After finding it Thompson and other agents watched it and saw Appellant leave an apartment and drive away in the Sebring. Appellant matched the physical description of the shooter that Cortes had provided. As Appellant drove away, the phone's ping location corresponded with the Sebring's travel.

When Appellant parked at a nearby apartment complex the phone ping stopped at that same location. Appellant got out of the car and met a man and a woman in the parking lot. Thompson arranged for uniformed officers to approach the group and request identification, and then Thompson approached them. He saw a cell phone sitting on the Sebring's trunk. Barnes called the Metro PCS number, and the phone on the trunk rang. Appellant was taken to the police station for questioning.

Detective Barnes interviewed Appellant after giving him *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436 (1966). The interview was videotaped, and the relevant portions were published to the jury. Appellant said that he did not know his way around town very well because he had recently moved to Dallas, and he stayed in one general area around his apartment. Appellant acknowledged that the Sebring he had been driving belonged to his girlfriend. He denied knowing Cortes or Delgado.

During the interview, authorities executed a search warrant on the Sebring and found a .40-caliber Smith and Wesson pistol underneath the center console. DPD firearms examiner Susan Kerr testified that the magazine found next to Hatcher's body would fit and could be used to fire the pistol found in the Sebring. Kerr further testified

that the fired cartridge found on the floorboard of Hatcher's car was fired from the pistol found in the Sebring.

When Barnes confronted Appellant with Kerr's findings, Appellant's demeanor changed. Appellant first claimed that he had bought the pistol from Cortes, but she was already in jail on the date he named. Eventually he admitted that he had been present during Hatcher's murder, but he asserted that Cortes was the shooter. He claimed that the offense was only supposed to be a robbery, but that Cortes shot Hatcher while he was struggling with Hatcher over her property.

After he was booked into the Dallas County Jail on a capital murder charge Appellant called his girlfriend who asked him why he would keep the gun. Appellant responded, "I don't know, man. Stupid as fuck." She later said, "If you shot that girl with that gun, you should've . . . [thrown] it away or something." Appellant replied, "I know, man, I know. Too late now though."

DPD criminal intelligence analyst Michael Freeman used call-detail records and data extracted from Appellant's, Cortes's, and Delgado's cell phones to summarize cell phone activity between the three co-defendants around the time of the offense. He also mapped the cell towers that Appellant's and Cortes's cell phones hit on the day of the offense.

At 10:36 a.m. on the day of the offense Appellant's phone hit on a tower near a Jack in the Box located at Interstate Highway 35 and Royal Lane. Cortes's phone hit near the same location at 10:34 a.m. At 11:31 a.m., Appellant's phone hit on a cell tower near

Hatcher's apartment.  Cortes's phone hit near the same location at 11:37 a.m.  But Appellant's phone was inactive between 3:29 p.m. and 7:47 p.m., and Cortes's phone was inactive between 4:17 p.m. and 7:40 p.m., suggesting that they had turned off their cell phones during these periods.  When Cortes turned her phone back on it pinged on a tower close to Hatcher's apartment.  At 7:47 p.m. Cortes received a call from Ortiz's cell phone.

Between August 1 and September 30, Delgado contacted Cortes 131 times by call or text, Cortes contacted Delgado 95 times by call or text, Appellant contacted Cortes 111 times by call or text and Cortes contacted Appellant 23 times by call or text.  Appellant last texted Cortes on September 4, asking, "Wats up wit da kush?"

Around the time Appellant met Delgado, he began communicating with a person named "Mustang" in his phone's contacts.  This number did not match Delgado's known phone number.  But because other evidence showed that Delgado often drove her cousin's Mustang, the State argued that "Mustang" was the number for a second phone that Delgado had.  Freeman testified that Mustang texted or called Appellant 23 times, and that Appellant contacted Mustang one time by phone call or text.

The day after the shooting, Appellant searched the internet for "killings in Dallas" and "Dallas news today"; clicked on the headline, "Woman murdered in Uptown Dallas parking garage"; searched for a "gun shop in 75237", his zip code; and looked up "Gold & Gun Swap Shop" in Dallas.  Over the next two weeks he continued to search the

internet for "Dallas homicide" and for specific news articles about Hatcher's murder. His phone also contained images of the type of pistol that was used to murder Hatcher.

**II.B.2.  Analysis**

Appellant argues that the corroborating evidence is insufficient because the parking garage's security video does not show that he pulled the trigger and "[t]here are 45 seconds in which nothing can be seen or heard."  He avers that Cortes stepped out of the Jeep, shot Hatcher, turned the Jeep around, and exited the garage during this 45-second interval.  Appellant contends that Cortes's testimony—that she drove around the parking garage during this interval, trying to find an exit—is implausible because Cortes had been to the garage many times.

Appellant's videotaped admission that he was present at the scene of Hatcher's murder and actively participated in her robbery was sufficient by itself to connect him to the crime.  *See Solomon*, 49 S.W.3d at 362; *Cook*, 858 S.W.2d at 470.  In addition, the murder weapon was hidden in his girlfriend's car, and Appellant was driving it immediately before his arrest.  His cell phone data showed his extensive contact with his two co-defendants leading up to the offense, proximity to Hatcher's apartment on the day of the offense, and numerous post-offense web searches for information on Hatcher's murder.  Two days after the shooting he texted Cortes to ask about the "Kush" which was supposed to be one way to pay him for the killing, and he made damning admissions to his girlfriend in his recorded conversation with her from jail.  In sum, the evidence satisfied Article 38.14.

Point of error twenty-four is overruled.

## II.C.  Future Dangerousness

In point of error thirty-four Appellant claims that the evidence is legally insufficient to support the jury's affirmative answer to the future dangerousness special issue.  The issue requires the jury to determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  Article 37.071, § 2(b)(1).  In deciding the future dangerousness special issue, the jury is entitled to consider evidence admitted at both the guilt and punishment phases of trial.  *Devoe v. State*, 354 S.W.3d 457, 462 (Tex. Crim. App. 2011).  We review the evidence in the light most favorable to the verdict.  *Jackson*, 443 U.S. at 319; *Williams v. State*, 273 S.W.3d 200, 213 (Tex. Crim. App. 2008).  Assessing the evidence and reasonable inferences from it in this light, we ask whether any rational trier of fact could have believed beyond a reasonable doubt that there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society.  *Williams*, 273 S.W.3d. at 213.

The circumstances of the offense alone may be sufficient to support an affirmative answer to the future dangerousness special issue.  *Buntion v. State*, 482 S.W.3d 58, 66 (Tex. Crim. App. 2016).  For example, a premeditated killing and general disregard for human life will support a finding of future dangerousness.  *See Sonnier v. State*, 913 S.W.2d 511, 517 (Tex. Crim. App. 1995) (premeditation); *Ford v. State*, 919 S.W.2d 107, 112 (Tex. Crim. App. 1996) (disregard for human life).  Other relevant factors include a

defendant's criminal history, an escalating pattern of lawlessness and violence, lack of remorse, and blame-shifting. *See Jones v. State*, 119 S.W.3d 766, 781 (Tex. Crim. App. 2003) (criminal history); *Swain v. State*, 181 S.W.3d 359, 370 (Tex. Crim. App. 2005) (escalating pattern of violence); *Smith v. State*, 74 S.W.3d 868, 872 (Tex. Crim. App. 2002) (escalating lawlessness); *Ford*, 919 S.W.2d at 112 (remorselessness and blame-shifting). These factors support the jury's affirmative finding in this case.

## II.C.1 Punishment Evidence

Appellant had a lengthy criminal history in Tennessee. On March 21, 2001, Appellant, then a juvenile, committed: theft of an automobile; evading arrest by vehicle; reckless endangerment; unlawful possession of a weapon; leaving the scene of an accident; and reckless driving. He spent the next six months in the Youth Services Bureau's custody. After his release, he committed burglary of a habitation with the intent to commit theft on September 9, 2002. In August 2003, he pled guilty to that burglary and received two years' probation as part of a judicial diversion program, but that probation was revoked less than a year later.

On December 29, 2003, he evaded arrest. The next day he committed aggravated robbery and aggravated assault against Cory Turner and aggravated assault against Lequite Turner and was later sentenced to three years in prison for these crimes. On July 2, 2004, he committed aggravated robbery against Tracey Denton. He admitted using a stolen vehicle to commit the robbery. He was later sentenced to eight years in prison for the robbery of Denton.

Following a March 2013 traffic stop he was charged with being a felon in possession of a firearm after a gun was found hidden in the car he was driving. After that arrest he sold another gun in Memphis that he had illegally possessed. An arrest warrant was pending for his failure to appear on the felon-in-possession charge when he committed the capital murder in Dallas.

Appellant also committed various unadjudicated crimes in Texas. He admitted to Barnes that he had been selling drugs in Dallas before killing Hatcher, and his phone data confirmed his drug dealing. His phone data also suggested that he was trying to become a pimp; there were many entries for "Backpage," a black-market website used for soliciting sex and promoting prostitution.

Appellant's tattoos were also telling: "Life or Death" surrounded by dollar signs on his chest, a handgun on his left side, and an AK-47 with "One Man Army" on his back. While in jail awaiting trial for capital murder, he added bullet holes and smoke to the AK-47 tattoo, committing a major violation of the jail's rules by having himself tattooed while in custody.

Todd Harris, Senior Warden for the Texas Department of Criminal Justice's Polunsky Unit, testified about TDCJ's inmate security classifications and how those classifications affect inmates' housing, job opportunities, and privileges. Harris stated that, despite TDCJ's best efforts to control inmate behavior, some inmates are still able to obtain contraband, fashion weapons, and engage in violence.

**II.C.2. Analysis**

Appellant murdered Hatcher with premeditation, calculation, and forethought for payment, evidencing a disregard for human life. The same day that Appellant met Delgado and Cortes, he agreed to help them murder Hatcher. He helped plan every detail of the murder and helped watch and follow Hatcher to determine the best time to kill her. He suggested shooting Hatcher, volunteered to do the shooting, and obtained the pistol used in the shooting.

Appellant had many opportunities to disavow the plan, even on the day of the shooting—in the morning when he and Cortes waited outside Hatcher's office, in the afternoon before Cortes returned from dropping off her son, and in the evening while he lay in wait for Hatcher. Despite Hatcher's screams, Appellant shot her in the back of the head, took her belongings, returned to the Jeep, and fled the scene with Cortes. He did these things for some money and drugs. His willingness to murder a stranger for a small amount of money and drugs also demonstrated his disregard for human life.

In his interview with Barnes Appellant displayed no remorse over Hatcher's death, and he tried to shift blame for the offense. It seems that his only regret was that he had not tossed the gun after killing Hatcher.

Appellant's lengthy and violent criminal history supported the future dangerousness finding, too. It also demonstrated an escalating pattern of violence and disrespect for the law.

On this evidence, any rational jury could find against Appellant on the future dangerousness issue.

Point of error thirty-four is overruled.

## III. Voir Dire—Challenges for Cause

In points of error one through twenty-one, Appellant claims the trial court erred in denying twenty-one of his challenges for cause.

A juror is challengeable for cause by the defense if he has a bias or prejudice in favor of or against the defendant or the law on which the defendant is entitled to rely. Tex. Code Crim. P. art. 35.16(a)(9), (c)(2); *see Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009). "The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and follow instructions in accordance with the law." *Tracy v. State*, 597 S.W.3d 502, 512 (Tex. Crim. App. 2020). The law must be explained to the juror, and he must be asked whether he can follow the law regardless of his personal views. *Id*. The challenger bears the burden of establishing that the challenge is proper. *Id.* The challenger does not meet this burden until he has shown that the juror understood the law's requirements and could not overcome his prejudice well enough to follow the law. *Id.*

When assessing a trial court's decision to deny a challenge for cause, we review the entire record to determine whether sufficient evidence exists to support the court's ruling. *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010). We reverse only for a clear abuse of discretion. *Id.* Because the trial judge is in the best position to evaluate a potential juror's demeanor and responses, we review a trial court's ruling on a challenge for cause with considerable deference. *Gardner*, 306 S.W.3d at 295. When a

prospective juror's answers are vacillating, equivocating, ambiguous, unclear, or contradictory, we accord particular deference to the trial court's decision. *Tracy*, 597 S.W.3d at 512.

To prevail on a claim that the trial court erred in denying a challenge for cause, the defendant must also show harm. Harms depends on "whether a peremptory challenge was wrongfully taken from the defendant." *Newbury v. State*, 135 S.W.3d 22, 30–31 (Tex. Crim. App. 2004) (internal quotation marks and alterations omitted). Therefore, besides error, the defendant must also show that (1) he asserted a clear and specific challenge for cause; (2) he used a peremptory challenge on the complained-of veniremember; (3) his peremptory challenges were exhausted; (4) his request for additional strikes was denied; and (5) an objectionable juror sat on the jury. *Comeaux v. State*, 445 S.W.3d 745, 750 (Tex. Crim. App. 2014); *see also Newbury*, 135 S.W.3d at 31. The parties in capital cases are allotted fifteen peremptory challenges each. Article 35.15(a).

### III.A.  Byers, Parham, Slear, and Taylor

In points of error eighteen through twenty-one, Appellant complains about the denial of his challenges for cause to jurors Byers, Parham, Slear, and Taylor. Appellant still had peremptory strikes remaining when he challenged these jurors, but he did not strike them. Since he could have used peremptory strikes on them but did not, he suffered no harm from the trial court's rulings even if they were erroneous. *See Newbury*, 135 S.W.3d at 32. We overrule points of error eighteen through 21.

**III.B.   Remaining Veniremembers**

Appellant satisfied the conditions for showing harm from any error in the trial court's denial of his challenges for cause with respect to seventeen potential jurors. Appellant challenged each for cause and, as those challenges were denied, he used his peremptory strikes until he had none left.  He requested and was granted two additional strikes.  After his challenge for cause to veniremember Niesman (point of error seventeen) was denied, he identified Niesman as objectionable and requested but was denied a third additional peremptory strike.  Niesman became the twelfth juror.

Because the trial court granted Appellant two additional peremptory challenges, Appellant cannot show harm unless he demonstrates that the trial court should have granted at least three of his challenges for cause to these seventeen veniremembers.  *See Comeaux*, 445 S.W.3d at 749–50; *Chambers v. State*, 866 S.W.2d 9, 23 (Tex. Crim. App. 1993).

**III.B.1.  Thomas**

Appellant asserts several reasons that Thomas should have been removed for cause, but he only raised one of those reasons at trial.  Thus, he failed to preserve for our review those other reasons for his challenge.  *See* Tex. R. App. P. 33.1(a) (stating that a timely and specific objection at trial is required to preserve a complaint for appellate review).  In support of his preserved basis of review, Appellant cites Thomas's responses regarding the issue of venue and argues that Thomas would not have required the State to prove each element of his case beyond a reasonable doubt.

Under State questioning, Thomas testified that he would require the State to prove every element of its case beyond a reasonable doubt and agreed that if the evidence showed that the offense was committed in a county other than Dallas County, Appellant would be entitled to a not-guilty verdict. Thomas stated he would "follow all the evidence" and said he would follow the law.

Appellant emphasizes Thomas's testimony in response to questions by the defense. After drawing a distinction between "innocent" and "not guilty" that Thomas did not buy into, the defense attorney asked him how he felt about the possibility of having to say "not guilty" merely because the State failed to prove venue. Thomas answered:

> Based on that scenario you're giving me right there, one instance being out of area, then I would say -- I will not say the guy is totally innocent. I will not say he's not guilty. I would say that's an error that can be discovered later on, and the person has that right to bring that back up in an appeal to say that was wrong. For me, in that point right there, being out of the county, if the guy was found reasonable doubt [sic] he actually committed the crime, in my mind as it stays right now, I still will find him guilty.

Defense counsel challenged Thomas for cause, arguing that he would not hold the State to its burden to prove all the elements of the offense beyond a reasonable doubt.

Although the State must prove that an offense occurred in the county alleged in the indictment, its burden on that point is by a preponderance of the evidence. *See* Article 13.17 (requiring the State to prove venue by a preponderance of the evidence); *Schmutz v. State*, 440 S.W.3d 29, 34–35 (Tex. Crim. App. 2014) (concluding that venue error does not render the evidence legally insufficient because venue is not an element of the offense

that the State must prove beyond a reasonable doubt). No one explained this to Thomas, and counsel did not ask Thomas if he could follow the law despite any personal disagreement with it. *See Tracy*, 597 S.W.3d at 512.

In addition, Thomas stated during State questioning that he would require the State to prove all the elements of the offense beyond a reasonable doubt. Thomas's response to defense counsel's questions more reasonably evidenced confusion than a statement that he would not hold the State to its burden. *See Tracy*, 597 S.W.3d at 512; *see also Hogue v. State*, 711 S.W.2d 9, 20–23 (Tex. Crim. App. 1986) (finding that the veniremember's answers as a whole showed that he would follow the law and hold the State to its burden of proving venue). To the extent Thomas's answers were vacillating or ambiguous, we defer to the trial court's implicit determination that he could follow the law and render a verdict based on the law and the evidence. *See Tracy*, 597 S.W.3d at 512; *Burks v. State*, 876 S.W.2d 877, 893 (Tex. Crim. App. 1994).

Point of error one is overruled.

### III.B.2.  Veniremember Rackard

Appellant argues that the trial court should have excused Rackard because she had already determined his guilt due to media exposure, would not hold the State to its burden of proving every element of the offense beyond a reasonable doubt, and would automatically answer the special issues in a manner that resulted in a death sentence.

**a.** **Presumption of Innocence**

Rackard stated in her questionnaire that she thought she had heard some facts of Appellant's case through the media. Appellant emphasizes that when the State asked if she had formed an opinion about Appellant's guilt or innocence based on what she had heard, she answered, "I think I lean a little bit more to the guilty side." Appellant contends that this statement shows that Rackard was biased against him.

Rackard's subsequent responses do not support Appellant's contention. She agreed that Appellant was entitled to a presumption of innocence. She stated that the presumption of innocence meant that, if she were asked for a decision on Appellant's guilt or innocence right then, the verdict would have to be not guilty because the State had not proven anything; Appellant had "just been arrested." Rackard acknowledged the importance of the presumption of innocence and stated that she could "remove [her] emotion and just follow the law" which meant "listen[ing] to both sides" and answering "fairly."

Regarding her "leaning towards guilt" comment, Rackard explained, "Well, I mean, I don't know that it was him. That has to, obviously, be proven." She said that, in hearing about the case through the media, she had merely hoped that the perpetrators would be caught and punished. Rackard denied that she had a predetermined opinion about whether Appellant was one of the perpetrators. Rackard also repeatedly emphasized the importance of keeping an open mind and listening to the evidence.

Rackard was at most a vacillating juror. The trial court did not abuse its discretion in denying Appellant's challenge for cause based on the argument that Rackard had predetermined his guilt. *Gardner*, 306 S.W.3d at 295–96.

**b.      Burden of Proof**

Appellant contends that Rackard should have been dismissed because she would not hold the State to its burden of proof regarding venue.

The prosecutor showed Rackard the indictment and emphasized that the State had the burden of proving everything in it. When the prosecutor asked Rackard what the result would be if the State failed to prove that the offense happened in Dallas County, Rackard responded, "You would get a not guilty" verdict.

Defense counsel returned to this subject and asked Rackard if she would vote for an acquittal if the State had proved everything alleged in the indictment beyond a reasonable doubt except that the offense occurred in Dallas County. Rackard answered, "Not if it was the county." She understood that the law would entitle Appellant to an acquittal under that circumstance, but she said that she "would probably let that slide" if the State only failed to prove the county. She then stated that, although it would be very difficult for her to acquit Appellant if only the proof of venue were lacking, she would ultimately "have to do the right thing."

As with veniremember Thomas, a failure to require the State to prove venue beyond a reasonable doubt was not a proper basis for challenging Rackard. *See* Article 13.17; *Schmutz*, 440 S.W.3d at 34–35. Further, Rackard vacillated on this topic. She

gave one answer during State questioning but an opposite answer during defense questioning. She retreated from the answer she gave to the defense, stating that she would ultimately follow the law. We accord particular deference to a trial court's ruling under these circumstances, and thus we defer to its determination. *See Tracy*, 597 S.W.3d at 512. The trial court did not abuse its discretion in denying the challenge on this basis.

**c.      Automatic Death Penalty**

Appellant contends that Rackard would automatically answer the special issues in a way that resulted in the death penalty. He notes that on her questionnaire she said, "[H]arm to a child (or death), planned and calculated death to someone," was "the best argument for the death penalty." When defense counsel asked what she meant by "planned and calculated death to someone," Rackard explained: "Like, murder for hire. If there is a planned attack seeking out some one individual, a particular individual." Rackard's subsequent answers showed she meant that such a murderer should be eligible for the death penalty, not that such a person should automatically receive the death penalty.

Furthermore, the totality of Rackard's questionnaire and voir dire responses does not show that she would automatically answer the special issues in a manner that resulted in a death sentence. Rackard stated in her questionnaire that she believed the death penalty was appropriate in some cases, but not all, and that she did not believe in "an eye for an eye." From the stand she repeatedly emphasized that no two cases are the same,

that the particular circumstances should control the punishment, and that she would consider all the evidence presented at the punishment phase, if any, before answering the special issues.

The trial court did not abuse its discretion in denying the challenge for cause on the grounds that Rackard would automatically assess the death penalty.

Point of error two is overruled.

### III.B.3. Kays

Appellant contends that Kays was challengeable for cause he would need to hear evidence of remorse from Appellant. However, that complaint was not preserved because Appellant did not challenge Kays for cause on this basis at trial. *See* Tex. R. App. P. 33.1(a). Appellant's preserved complaint about Kays was that he would not hold the State to its burden of proof to show future dangerousness. He argued that Kays would lower the State's burden of proof on the future dangerousness special issue by requiring it to prove a probability that Appellant would commit only a single act rather than "acts" of violence. *See* Article 37.071, § 2(b)(1). The record does not support this argument.

During the State's questioning Kays averred that he would hold the State to its burden to prove future dangerousness because, "That's the law." Kays agreed there were no automatic answers to the future dangerousness special issue and that the answer might very well be "no."

Defense counsel questioned Kays at length about his understanding of the first special issue's requirements, especially the phrase, "criminal acts of violence." Kays initially stated that the word "acts" "would be singular." Defense counsel explained that, because the future dangerousness special issue states "criminal acts of violence," it "is actually looking for more than one act." When asked if proof of only one act would be enough for him, Kays said it would "depend[] on the act." Defense counsel re-emphasized that the future dangerousness special issue required the State "to prove to you there is a probability that he would commit acts that would constitute a continuing threat to society." Kays answered, "That's correct." Questioning continued:

> Q.      My question to you is, where I'm having a little bit -- I'm stuck. I get the feeling you're saying if they prove one act to you, that's going to be sufficient.
>
> A.      I don't think anyone can prove one act whatsoever. They are trying to do their best to show what the person might do down the road. To me -- I don't know. It's hard to determine whether or not it's going to be one or more. I don't know how you get to that point.
>
> Q.      That's just it. That's what they have to prove, and that's what I'm trying to make sure I get to.
>
> A.      That will be the next step in the process.
>
> Q.      It will be the next step in the process. That's why I'm trying to see where you are because I have to make sure we get 12 people on there to make sure that they prove that there's going to be a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society. Not an act of violence.
>
> You even -- a minute ago when I said if they prove a fight in prison, you said, if there was one, there is going to be many. That begs the question, do they even have to prove that to you? Because if you already assume if he's in prison there is going to be more than one fight, is that going to be an act

of violence to you? If it is, is it going to be multiple? Are you going to be predisposed to answering that simply because he's going to prison?

A.      I mean, what can I say?

Q.      That's just it. The only person that knows you is you. I'm trying to get to know you.

A.      It's an unknown to me, as far as getting there, because I've never been in any one of those seats.

Q.      I understand. That's why I said it's difficult, because we have to get you as close to being in that seat as we can to get what your thoughts are. It's their burden of proof on this special issue.

A.      That's what I said earlier, that each one of the cases have to be met.

Kays did not manifest an inability to require the State to prove beyond a reasonable doubt a probability that Appellant would commit criminal acts of violence. Instead, Kays's responses evidenced a desire to follow the law but confusion about how he was supposed to determine whether Appellant would commit criminal acts of violence in the future.  At most, Kays's answers were unclear or equivocal about his ability to follow the law.  We defer to the trial court's implicit determination that Kays was able to set aside any reservations that he may have had and render a verdict based on the law and the evidence.  *See Tracy*, 597 S.W.3d at 512.

Moreover, we have interpreted the future dangerousness special issue as "essentially a normative [question] as the Legislature declined to specify a particular level of risk or probability of violence."  *Coble v. State*, 330 S.W.3d 253, 267–68 (Tex. Crim. App. 2010); *see Estrada v. State*, 313 S.W.3d 274, 281–82 (Tex. Crim. App. 2010) (discussing our "commonsense" or "core" interpretation of the future dangerousness

inquiry). The future dangerousness special issue focuses on the degree to which a defendant "poses a real threat of future violence." *See Coble*, 330 S.W.3d at 268. Defense counsel's semantic wrangling with Kays did not compel the trial court to find that Kays had a bias against the law that he was unable to set aside.

Point of error three is overruled.

### III.B.4. Queen

Appellant argues that Queen would have required him to testify. However, he did not challenge Queen for cause on that basis at trial, so he failed to preserve that complaint. *See* Tex. R. App. P. 33.1(a). His preserved claim is that Queen was biased against him because she had been the victim of an attempted carjacking that presented a similar factual scenario to his case and because she favored the death penalty.

Queen disclosed on her juror questionnaire that she had been the victim of an attempted carjacking, and she told the prosecutor that the perpetrator had not been caught. She told the prosecutor that her emotions related to the incident would not affect her decision-making as a juror. When defense counsel pressed her on whether the two cases were similar, she explained that she did not think her would-be robber had intended to hurt anyone, noting that he had been armed with a butter knife. She denied that the experience would affect her as a juror at Appellant's trial because the two offenses did not seem comparable to her. Queen stated that the only lasting impression the incident had made on her was "[n]ot to be a naive 16 year old in a dark parking lot."

On her questionnaire Queen said, "If you're going to kill and carry a firearm, you should be prepared for the consequences and justify your actions if called upon." She also said that a life sentence was appropriate for some capital murder cases, depending on the evidence. During voir dire she said she felt the death penalty was appropriate for premeditated murder. But she said she would not automatically apply the death penalty and would consider all the evidence before answering the special issue, and she acknowledged that the default sentence is life without parole.

The trial court did not abuse its discretion in denying Appellant's challenge. Queen's responses supported a finding that her experience would not bias her against Appellant, and she was at most vacillating in her responses on the death penalty. The trial court was in the best position to assess her credibility. *See Gardner*, 306 S.W.3d at 295.

Point of error four is overruled.

### III.B.5. Kohn

Appellant argues that the trial court should have removed Kohn for cause because she would require Appellant to testify, and she would automatically answer "yes" to the future dangerousness special issue if she found him guilty of capital murder.

### a. Right Not to Testify

During State questioning, Kohn stated that it was "fair" that jurors cannot consider a defendant's decision not to testify. And when asked whether she could afford

Appellant his Fifth Amendment right not to testify, Kohn answered, "Absolutely.  It's his right."

When defense counsel questioned Kohn, he focused on her questionnaire where she said, "I believe a defendant should testify in his own defense even though the law does not require it."  Kohn explained that she had responded "Agree" to that statement because she had previously been a juror in a DWI case in which the defendant had testified, and Kohn felt that his testimony had benefitted him, because the jury had acquitted him.

Kohn continued, "So human nature makes me want to hear somebody speak and how they carry themselves and just to get an understanding of, you know, nonverbal language" and "just to add a human element to the person that you're making -- whose life you're holding in your hands."  When defense counsel followed up by asking Kohn if she would hold it against Appellant if he did not testify, she answered, "No.  No.  That's why he's got a legal defense team to make that decision, and there [are] pros and cons, I'm sure, both ways."

The trial court was in the best position to assess Kohn's demeanor and responses, and we defer to its resolution of the issue.  *See Gardner*, 306 S.W.3d at 295.

b.    **Future Dangerousness**

In her questionnaire, Kohn disagreed with the statement, "The state prison system in Texas can control inmates who have been convicted of violent offenses."  To the question "What would be important to me in deciding whether a person received a death

sentence rather than a life sentence" she answered "guilty beyond a reasonable doubt."

At voir dire defense counsel asked her whether that answer meant that in the case of a

murder in the course of a robbery, she thought "that before getting to the special issues

that the defendant should be sentenced to death?" She answered "At this point, I don't

know." When asked to hypothetically assume guilt beyond a reasonable doubt, she said,

"honestly, not necessarily, but, you know, I've got to hear more before I can form an

opinion."

Kohn repeatedly stated or agreed that the imposition of the death penalty should

depend on the facts and circumstances of an individual case. Her answers further showed

her understanding that a life sentence could not lawfully change to death unless the State

proved beyond a reasonable doubt a probability that Appellant would commit criminal

acts of violence that would constitute a continuing threat to society. Kohn pledged to

keep an open mind and not assess any automatic answers to the special issues.

On this record, the trial court was within its discretion to reject Appellant's

contentions that Kohn would automatically answer "yes" to the future dangerousness

special issue and hold a decision not to testify against him. *See Gardner*, 306 S.W.3d at

295.

Point of error five is overruled.

### III.B.6. Veniremember Tijerina

Appellant claims that Tijerina was not qualified to serve as a juror because he would not hold the State to its burden to prove every element of the offense beyond a reasonable doubt.

Under State questioning, Tijerina repeatedly affirmed that the jury would be required to return a "not guilty" verdict if the State failed to prove every element beyond a reasonable doubt.

When the defense questioned Tijerina, counsel asked him to imagine that the State had proven the elements except that it had shown that the defendant used a knife to commit the murder rather than a gun as the indictment alleged. Tijerina responded, "It's -- that's a slippery slope, to say the least. It's just the way the law says that, you know, I guess it wouldn't -- according to the law, it wouldn't meet the capital murder type scenario." Defense counsel observed that some people would purposely overlook the State's failure to prove the manner and means if they thought the defendant committed the crime. Tijerina explained that although in his opinion it would not be "right" for someone to "get people out of – to blame for what they've done" but that if that was what the law required, "then that's what we'll do." Counsel asked if that meant that Tijerina was saying that he "would still go along and follow the law in that situation," and Tijerina responded, "Yeah, I follow the law. I try to follow all the laws. Do we agree with them all? Like I said in the beginning, no, I do not."

At the end of questioning, defense counsel referred to Tijerina's responses to the gun/knife hypothetical and challenged him for cause on the ground that "he would find

someone guilty regardless of whether the State proved all the elements of the offense."

The trial court denied the challenge.

Jurors are not required to agree with the law. *See Tracy*, 597 S.W.3d at 512.

Jurors are only required to follow the law. *See* Article 37.071, § 2(e)(1). Tijerina's

testimony supports a finding that he would follow the law whether he agreed with it or

not.

Point of error seven is overruled.

### III.B.7. Rose

Appellant asserts that Rose would automatically assess the death penalty due to his

strong religious beliefs, but he did not preserve this assertion because he did not raise it at

trial. *See* Tex. R. App. P. 33.1(a). Appellant also contends that the trial court should

have excused Rose from jury service because he would automatically answer "no" to the

mitigation special issue, and he preserved this contention.

On his questionnaire Rose said he "somewhat" agreed that "A convicted capital

murderer's accomplishments or good deeds in his life should not matter in deciding

whether he should get the death penalty or not." He also disagreed on the questionnaire

that a person's background or life history does not matter in assessing punishment. Rose

wrote on his questionnaire that a person's punishment "should be based on [the]

evidence" and "circumstances," and that he would have "no problem" listening to mental

health evidence.

Rose was not required to find any "particular type of evidence to be mitigating." *See Standefer v. State*, 59 S.W.3d 177, 181 (Tex. Crim. App. 2001). The law only required Rose to be able to consider all the evidence presented at Appellant's trial in determining his answer to the mitigation special issue. *See* Article 37.071, § 2(e)(1). His testimony supports a finding that he could satisfy that requirement. He repeatedly expressed the belief that not all capital murders should necessarily be punished by death, and he indicated that he could keep an open mind. Rose acknowledged that he might not find any evidence sufficiently mitigating to answer the mitigation special issue "no" after finding a defendant guilty of capital murder and answering "yes" to the future dangerousness special issue. But he denied that his answer to the mitigation special issue would always be "no" under those circumstances. To the extent Rose gave contradictory, equivocal, or unclear answers, the trial court was in the best position to resolve the issue. We defer to its determination. *See Gardner*, 306 S.W.3d at 295.

Point of error eight is overruled.

### III.B.8. Parker

Appellant claims that Parker was challengeable for cause on several bases that he did not rely on at trial. Those claims were not preserved for review. *See* Tex. R. App. P. 33.1(a). He also claims Parker should have been struck for cause because her questionnaire shows that she was "mitigation-impaired" because she would not consider genetics, upbringing, environment, or mental health evidence in answering the mitigation special issue. However, Parker's voir dire testimony in its entirety shows the opposite.

Parker explained that she had either misread the questions or not realized what they were asking. In any case, the law did not obligate Parker to find any particular evidence mitigating. *See Standefer*, 59 S.W.3d at 181. Instead, the law obligated Parker to consider all the evidence presented at Appellant's trial. *See* Article 37.071, § 2(e)(1). Her testimony indicates that she understood and could fulfill that obligation. The trial court did not abuse its discretion by denying the defense's challenge for cause on the ground that Parker was mitigation-impaired.

Point of error nine is overruled.

### III.B.9. Veniremember Theis

Appellant argues that Theis was challengeable for cause because he would not meaningfully consider the defense's mitigation evidence and would automatically answer the mitigation special issue "no," and because he had job concerns that would affect his ability to serve as a juror.

### a. Mitigation

Appellant refers to Theis's questionnaire in which Theis suggested that evidence of a defendant's background, upbringing, genetics, mental health history, accomplishments, good deeds, and environment do not matter when determining the appropriate punishment for capital murder.

But Theis gave these answers before the parties had explained the law to him, so they would not support a challenge for cause. *See Tracy*, 597 S.W.3d at 512. Further, the law did not require Theis to find any particular evidence mitigating. *See Standefer*,

59 S.W.3d at 181. Instead, the law required him to be able to consider all the evidence presented at Appellant's trial. *See* Article 37.071, § 2(e)(1).

After the law was explained to Theis, he stated that he understood it. Theis further asserted that he could set aside his personal beliefs and follow the law if seated as a juror. Theis noted that he answered the juror questionnaire without previously having thought deeply about the death penalty. He assured defense counsel that he would "be open and listen to all the facts and all the evidence, as well as, you know, any personal background or things that should change my -- you know, my feeling based on the decision that's made up to that point. So I think just that I am open-minded." Theis also promised several times that he would not automatically answer the mitigation special issue "no" if the jury convicted Appellant of capital murder and answered "yes" to the future dangerousness special issue.

To the extent any of Theis's answers were contradictory, equivocal, or unclear, the trial court was in the best position to determine his ability to follow the law. *See Gardner*, 306 S.W.3d at 295. We defer to its determination.

**b. Job Concerns**

Theis expressed concern about serving as a juror because he was due to start a new job. During voir dire he at one point answered "no," he did not think he could set aside his employment concerns to focus on the case. At other times, however, he said that his job stress would not make him unfair, and he assured counsel several times that he could be fair, pay attention to the proceedings, and fulfill his oath as a juror. It is not an abuse

of discretion to deny a challenge to a juror that expresses work distractions but also states he can be fair. *Garcia v. State*, 887 S.W.2d 846, 859 (Tex. Crim. App. 1994). Additionally, Theis gave contradictory answers about his ability to set aside his employment concerns, so we defer to the trial court's decision. *Gardner*, 306 S.W.3d at 295.

Point of error ten is overruled.

### III.B.10.  Applebaum

Appellant claims that Applebaum was challengeable for cause because she would automatically find police officers more credible than other witnesses, and she would not meaningfully consider any mitigating evidence.

### a.        Police Officer Credibility

When questioning Applebaum, the prosecutor observed that many people feel a special connection with the police and therefore are inclined to automatically find their testimony more credible than that of other witnesses. Referring to Applebaum's questionnaire, the prosecutor noted, "You said they are just the same -- you would treat them the same as anybody else that got up there to testify. And that's what the law would ask of you. It doesn't matter if a cook, a baker, a lawyer, a priest, or a police officer testifies, that you hold them all to whatever your same measuring stick is." Applebaum responded, "Yes."

However, she also agreed on her questionnaire that, "If the police charge someone with a crime, he or she is probably guilty." Applebaum told defense counsel she selected

this response because she "believe[d] in the police officers in our society" and "back[ed] them based on they're supposed to follow the law as well." She continued, "So if they're the one investigating the crime and say someone is guilty, I am definitely going to be listening to that testimony. They were the ones there after the crime, I guess I should say, collecting the evidence. And you've got to make your decision based on something." Applebaum retreated from her "Agree" response, stating that she "would have to say 'uncertain' until [she] heard the information[.]" Applebaum added, "[B]ut I mean, you have to get your information to make your decision somehow, and I back the blue and that would definitely be a part of my decision-making."

Defense counsel told Applebaum that many people shared her attitude because the police "are professionals, supposed to do a job and their duty." Counsel said that attitude might lead people like Applebaum to say, "I'm going to give police officers a little more credibility by nature of the fact of their position." Counsel asked, "Is that what I'm hearing from you, Ms. Applebaum?" She answered, "Yes." But when asked if she believed a person is more likely to be guilty if the police arrest and charge him, she said "I'm not going to make that assumption, no."

Applebaum at most vacillated in her answers about automatically giving more credibility to police officers. In such situations, we defer to the trial court's resolution of the issue. *See Tracy*, 597 S.W.3d at 512.

b.    **Mitigation Bias**

Appellant claims that Applebaum was "mitigation impaired" because her questionnaire disagreed that genetics, birth circumstances, upbringing, and environment should be considered when determining punishment in a capital case.

When defense counsel asked her about the response, Applebaum explained that the day that she had completed the questionnaire had been "very overwhelming." Applebaum was not sure what she had been thinking at the time and noted that many of the terms were new to her. She said that she now realized that the factors listed in the questionnaire "would play right into these two special issues, No. 1 and No. 2." Applebaum stated that she now understood what capital murder was and asserted,

> I'm not going to make a decision on anybody's life until I have all the facts, and part of the facts are going to be the things that you're mentioning in here, your environment, your upbringing. And so I guess I put for capital murder "no," but the answer is in capital murder "yes," I'm going to consider everything -- I don't take this lightly."

Applebaum also assured both sides several times that she would maintain an open mind and consider any evidence presented. Further, she stated in her questionnaire that testimony on subjects such as mental health would be a "[g]reat idea!"

The trial court did not abuse its discretion by denying Appellant's challenge for cause to Applebaum. *See Gardner*, 306 S.W.3d at 295–96.

Point of error eleven is overruled.

### III.B.11.  Roman

Appellant argues that Roman should have been struck for cause for several reasons that he did not raise at trial, so these arguments were not preserved for review. *See* Tex.

R. App. P. 33.1(a). He also contends that Roman was "mitigation-impaired" because he would consider the two special issues in conjunction rather than sequentially and so would always answer "no" to the mitigation special issue.

Roman vacillated regarding his understanding of the mitigation special issue and the requirement that jurors consider it only if they first have answered "yes" to the future dangerousness special issue. Roman told defense counsel, "Based on what you explained the procedure was, [both special issues are] going to be considered at the same time and you're going to have to consider them pretty much in conjunction." But when the law was clarified for Roman, he affirmed that he would answer the two special issues separately and sequentially. Roman told the State that he would consider the future dangerousness special issue first and only reach the mitigation special issue if the jury answered "yes" to the future dangerousness special issue.

Roman initially told defense counsel the same thing and affirmed that he would "back up" and reconsider all the evidence before answering the mitigation special issue. Roman further affirmed that he would answer "yes" to the mitigation special issue if he found something sufficiently mitigating after re-examining the evidence. Roman denied that he could never find something sufficiently mitigating to warrant a "yes" answer to the mitigation special issue. Roman's testimony reflected his eventual understanding of the law and willingness to follow it.

To the extent that Roman vacillated regarding his understanding of the law or his ability to follow it, the trial court was in the best position to resolve the issue. *See Gardner*, 306 S.W.3d at 295. We defer to its determination.

Point of error twelve is overruled.

### III.B.12. Johnston

Appellant argues that Johnston (also referred to as "Johnson" in the record) was challengeable for cause because she would give a police officer greater credibility than a lay witness.

The prosecutor told Johnston that the law required that jurors not automatically give police officer witnesses more or less credibility than other witnesses. Johnston stated that she understood and could fulfill that requirement. The prosecutor then asked Johnston about her questionnaire statement that she considered police officers more credible than most witnesses. After again asserting that she could approach all witnesses' testimony from a neutral perspective, Johnston explained:

> Yes, I put down I would give police a little more weight simply because they're trained responders. They are -- in these situations, they are more likely to know exactly what's going on, whereas if you have just been thrown into some crisis, people -- and it's a one-time thing for you, a police officer's observations are going to be more believable than yours.

Johnston elaborated that she was thinking "[m]ore along that line" when she wrote her response—"Not whether they're truthful or not but that they have a better understanding."

Johnston gave a similar explanation to defense counsel:

> For police officers, are they telling the truth or not telling the truth, I think that would be even for everybody. But if a police officer were to say the car was blue whereas somebody else said it was red, I would be more likely to believe the police officer because they're trained to observe these things.

She compared policing to her military and nursing experience; as a "trained observer" she is "trained to look at what's happening" in high-stress situations, "whereas regular people are not." She explained, "And as far as I know, police are the same way." Defense counsel asked:

> Q.    So it actually kind of sounds like you would give them a little more credibility based on that they're a police officer?
>
> A.    On situations and what they saw and observed I would, but as to opinions and whether I think they're telling the truth or not, it wouldn't be more. It would be the same, if you can separate those two things.
>
> Q.    I'm trying to, but the scenario you gave, whether it was red or blue, you said you would give the officer a little more credibility, and that's what you mean?
>
> A.    Yes.

Where a prospective juror testifies that "she believes a police officer would always tell the truth, this Court has construed such a belief to constitute a bias or prejudice against the defendant." *Montoya v. State*, 810 S.W.2d 160, 171 (Tex. Crim. App. 1989). However, Johnston made no statement implying that she believed that police officers would never lie on the witness stand. In fact, she expressly stated that "telling the truth or not telling the truth . . . that would be even for everybody." *See Lane v. State*, 822 S.W.2d 35, 44–45 (Tex. Crim. App. 1991) (finding no abuse of discretion in overruling challenge for cause based on claim that veniremember was predisposed to believe police

officers where veniremember never stated or implied a belief that police officers would always tell the truth); *see also Montoya*, 810 S.W.2d at 171–72 (same).

Further, Johnston's attempts to explain herself made her a vacillating juror. In such situations, we defer to the trial court's resolution of the issue. *See Tracy*, 597 S.W.3d at 512.

Point of error thirteen is overruled.

### III.B.13. Summers

Appellant asserts that Summers was challengeable for cause for various reasons not raised at trial and so not preserved for review. *See* Tex. R. App. P. 33.1(a). In support of his preserved complaint that Summers would automatically assess the death penalty in the event of a conviction, Appellant notes Summers's response to the State's hypothetical about convicted capital murderer Karla Faye Tucker.

The prosecutor related that Tucker had killed her two victims with a pickax and derived sexual pleasure from it. But she had been rehabilitated in prison, and two competing camps arose as her execution date neared. One group believed that Tucker should still be executed, while the other group believed that the governor should commute her sentence. In the end, Tucker was executed. The prosecutor asked Summers what she would have done if she had been the governor. Summers answered:

A. She should pay for her crime.

Q. Why do you feel that way?

A. Because anybody can change. What's to say she won't change back, and you have to pay the consequences for your actions. If you kill

somebody, you can't bring them back just because you're changed. Good for you, now that part of your life was better than the previous part, but that doesn't change what happened.

The prosecutor then outlined the stages of a death penalty case. He emphasized that the State believed that its evidence and the law would lead the jury to convict Appellant of capital murder beyond a reasonable doubt and to answer the special issues in a way that resulted in Appellant receiving the death penalty. The prosecutor asked Summers whether she could participate in a process that might end with Appellant being executed. Summers replied:

> I think so. I mean, I don't know anything about this case at all, like, nothing, so I look at this person and if I just saw him on the street, it would just be anybody. That's who he is right now to me. But if I found out he killed somebody with a pickax and got sexual pleasure out of it, I would probably want him to die. I don't know anything about this, so it doesn't change my feeling.

After this exchange, the prosecutor segued to the punishment phase special issues. The prosecutor emphasized that for there to be a punishment phase, the jury would have necessarily determined that Appellant intentionally killed another human being in the course of committing or attempting to commit robbery. He noted that the law required that jurors not make automatic decisions on punishment. Summers affirmed that her mind would remain "open to listening to all the evidence" and only afterward would she determine the answers to the special issues. Summers promised that she would give no automatic answers, explaining, "No, because it's someone's life. It's kind of a big deal."

The prosecutor then focused on the future dangerousness special issue. Summers affirmed that she "totally understood" what the future dangerousness issue asked her to decide and that it made sense to her.

Regarding mitigation, the prosecutor explained that jurors would not reach this issue unless they first found beyond a reasonable doubt that Appellant was guilty of capital murder and that the answer to the future dangerousness special issue should be "yes." Summers thought it was "really good" to require that jurors take "one last look before [deciding] if someone's going to get a death sentence." When the prosecutor emphasized that "[y]ou can't say, I find him guilty, future danger, death sentence" because it would not be fair, Summers responded, "Exactly. I feel you have to really think about it. It's someone's life." The prosecutor asked her if she understood the special issues and if she could be a fair juror, and Summers stated, "I definitely think I can be fair. I have a lot of compassion for people, but I also can be fair. Like I said, I believe in the death penalty."

Defense counsel asked Summers to state her thoughts about the death penalty if she and the other jurors found Appellant guilty of capital murder. Summers answered,

> Well, I mean, there would still have to be other information that you know about to make that determination. Obviously, if the person committed those crimes -- I don't know what the crimes are, then they would need to have some kind of punishment for that, but there are so many other things you have to know before I could answer a question like that.

Defense counsel asked Summers to imagine that the jury had also answered "yes" to the future dangerousness special issue and what her thoughts would be.  She replied: "Then I would definitely consider the death penalty as an option."

Referring to the prosecutor's hypothetical about Tucker, defense counsel suggested that Summers's response showed that she was "one of these people if I find it's a heinous crime and he's going to victimize people, that's all I need."  Summers denied this:

> I don't have any facts. That's not what I'm saying. I'm a very open person, and I think I'm very fair. I have a lot of compassion for people. I have compassion for him. I don't even know him. Like I said, he's just a person on the street to me. I have no opinion of him. You're not -- that's too vague for me to really answer that without facts. I'm a person that really works with facts and thinks a lot about them.

Summers assured defense counsel that if she found someone guilty of capital murder and answered "yes" to the future dangerousness special issue, she would "absolutely" also "go on and listen to Special Issue No. 2[,]" giving that issue "meaningful consideration."

Defense counsel asked Summers about her "[m]aybe but not really" response on the questionnaire that genetics, circumstances of birth, upbringing, and environment should be considered when determining the proper punishment for someone convicted of a crime.  Summers explained that she sometimes saw things on the news about criminal defendants "try[ing] to use something that's not true, like, oh, they had a bad mother or whatever, when it's kind of BS.  It could be true, but I have seen that to be also [sic].  So, I mean, when I answered it, that's -- yeah, maybe it could be, but, you know[.]" Summers continued,

There are a million circumstances. It's very vague. Maybe it could. It depends on what it was. When I was answering that question, what I was thinking about is the more BS stuff. If somebody's convicted of a crime, they've totally done the crime and now they're going to go back and try to pull something to sort of get out of it. I think we've all seen that[.]

She added, "But there could also be times when there was really something that, you know, caused it."

In sum, Summers repeatedly expressed that the death penalty was appropriate in some circumstances but not all and that any decision would depend on the specific facts. She rejected the idea of "an eye for an eye" because "life is much more complex." Although Summers thought a murderer like Tucker should die, she added that she did not know the facts of Appellant's case. Summers affirmed several times that she would keep an open mind as to the special issues if she found Appellant guilty of capital murder, and she stated that she would not give automatic answers. The record supports a finding that Summers could answer the punishment phase special issues based on the facts and the law. *See Davis*, 329 S.W.3d at 807.

Point of error fourteen is overruled.

### III.B.14. Foster

Appellant claims that Foster was challengeable for cause because she would require him to express remorse in violation of his Fifth Amendment and due process rights and because she was biased toward police officers. He did not challenge Foster on these bases at trial, so they are not preserved for review. *See* Tex. R. App. P. 33.1(a).

His preserved complaints are that Foster would automatically assess the death penalty and was "mitigation-impaired."

a.       **Automatic Death Penalty**

On her questionnaire, Foster indicated that she believed that some crimes call for the death penalty solely based on their facts and regardless of prior violent history, "especially on a child or sexual assault of the deceased." When asked to explain during voir dire, she said "there is just no second guessing for me. That if you murdered a child, there just seems to be no redemption, I want to say." When asked if the death penalty should be automatic for those who murder children or for murder in the course of a rape, she said, "Yes." She also stated that she would want a remorseless killer to receive the death penalty.

However, Foster also said she could follow the law and would not automatically assess the death penalty. She said that she would hold the State to its burden to prove future dangerousness beyond a reasonable doubt and acknowledged that she would answer "no" on the future dangerousness special issue if the State failed its burden. She understood that the default sentence was life and said that she would not automatically apply the death penalty in the event of a conviction but would answer the special issues based on the evidence she heard.

On this record the trial court did not clearly abuse its discretion in denying the challenge for cause on grounds that Foster would automatically assess the death penalty. *See Gardner*, 306 S.W.3d at 295–96.

**b.      Mitigation-impaired**

On her questionnaire Foster indicated that she strongly agreed that "A convicted capital murderer's accomplishments or good deeds during his life should not matter in deciding whether he should get the death penalty."  During voir dire she said she "probably misread that question" when she answered it.  She said she could follow the law and that she would "take into all of the considerations whenever you're considering punishment or anything like that because not one box fits all."

Foster also said on her questionnaire that genetics, circumstances of birth, upbringing, and environment should "[n]ot always" be considered because "we can take responsibility for our own selves at sometime in our lives."  During voir dire she explained, "Some people can continue to blame everybody else for the things that happened in their life, and then there are other people that the same thing has happened to but they have managed to pull themselves up."  Following that explanation, she agreed to keep an open mind and meaningfully consider any evidence.

Jurors are not required to find any particular evidence mitigating.  *Standefer*, 59 S.W.3d at 181.  Rather they must consider all the evidence.  *See* Article 37.071, § 2(e)(1).  The record shows Foster was capable of considering all the evidence, so she was not mitigation-impaired.

Point of error fifteen is overruled.

**III.B.15.  Stejskal**

Appellant claims that Stejskal was challengeable for cause because she would automatically assess the death penalty if the jury convicted him of capital murder, and she would not consider mitigation evidence.

**a.      Automatic Death Penalty**

On her questionnaire Stejskal wrote that some crimes "are unforgivable" and deserving of death "solely because of the severe facts and circumstances."  She explained that she was thinking of "[s]erial killers, that kind of thing" as the kind of cases that warranted the death penalty as a punishment option and that "there are just some people that I don't think should stay around."  When questioned by defense counsel, she denied that she was the kind of person who would automatically answer "yes" to the future dangerousness special issue:  "I don't think so.  I mean, we still have to prove Special Issue No. 1."

Stejskal described herself as someone who believed that the death penalty was appropriate in some but not all murder cases.  Although she believed in "an eye for an eye," it would depend on the circumstances.  She also expressed that life in prison could be an appropriate punishment, depending on the facts.

Further, Stejskal assured the prosecutor that there was "no question" that she could follow the law if she were selected as a juror and would not give any automatic answers to the punishment issues.  Stejskal opined that it was "good" that the law required jurors to answer a mitigation special issue even if jurors answered "yes" to the future dangerousness special issue.  She did not "think anybody should just rush into [assessing

the death penalty].” Instead, “[t]hey should be able to go back and look at” whether that was the right decision. Stejskal added, “I think that Special Issue 2 should be something that is definitely considered. I mean, we're talking about somebody's life.”

The trial court was in the best position to evaluate Stejskal's demeanor and responses, and we defer to its ruling. *Gardner*, 306 S.W.3d at 295.

### b.      Mitigation Bias

Appellant argues that Stejskal would not meaningfully consider any mitigating evidence if the jury convicted Appellant of capital murder. The record does not support Appellant's assertion.

As discussed above, Stejskal expressed approval of the mitigation special issue and stated that mitigating evidence “should definitely be considered” if the jury convicted Appellant of capital murder and found that he posed a future danger. The prosecutor noted that on her questionnaire Stejskal:

• listed “a person's character” as an important factor in deciding whether a defendant received a death sentence rather than life without parole;

• responded “Somewhat Agree” to an assertion that a person's background and life history did not matter in determining whether the person received the death penalty;

• answered, “It's possible; the person may not be a completely bad apple,” regarding the possibility of rehabilitation in prison; and

• wrote, “Maybe some, depending on the crime,” to answer whether a defendant's upbringing and circumstance of birth should be considered in determining whether he should receive a death sentence.

The prosecutor explained how all these factors could be relevant to the mitigation special issue.  Stejskal affirmed that she could meaningfully consider all the evidence in answering the mitigation special issue if the trial reached that point.

When defense counsel questioned Stejskal about her ability to meaningfully consider mitigating evidence, Stejskal denied that she would automatically answer the mitigation special issue "no"; she would need to hear the facts because even after an affirmative answer to future dangerousness, "you never know what might come next."

She explained why she "[s]omewhat [d]isagree[d]" that "A person's background or life history does not matter in deciding whether or not he should get the death penalty":

> It's just one of those things that until you know what the story is or what happened, it's -- I don't know how I would feel or what I would think at that point. I would have to know the specifics, the facts to be able to determine whether or not it would influence me at all.

Stejskal gave a similar answer when asked why she "[s]omewhat [d]isagree[d]" that "A convicted capital murderer's accomplishments or good deeds during his life should not matter in deciding whether he should get the death penalty":

> Yeah, I mean, I just -- I don't know. As far as, I guess, you know, if -- if he was a hero or something and that came out, it's part of the character, I guess, just determining if -- again, if this is somebody that is going to cause problems in the future. I don't know without knowing everything. I couldn't answer that.

Defense counsel then asked whether Stejskal understood that those two questions spoke to the mitigation special issue and whether she would take into consideration the facts related to those two questions as the law required.  She said "yes" to both questions.

When asked again, she again affirmed she would "wait and listen to the evidence and then make that determination."

Stejskal testified that she would meaningfully consider all the evidence presented to her in answering the mitigation special issue. That was all the law required of her; she was not required to find any particular evidence mitigating or sufficiently mitigating. *See Standefer*, 59 S.W.3d at 181. Further, the trial court was in the best position to judge her demeanor and the credibility of her responses. To the extent any of Stejskal's answers about her ability to follow the law were vacillating, equivocating, ambiguous, unclear, or contradictory, we defer to the trial court's decision. *See Tracy*, 597 S.W.3d at 512.

Point of error sixteen is overruled.

### III.B.16.  Wiley and Niesman

Because Appellant received two additional peremptory strikes, he cannot demonstrate harm unless he shows that the trial court erroneously denied at least three of his challenges for cause. *See Chambers*, 866 S.W.2d at 23. Appellant contends that the trial court erred by denying seventeen of his challenges for cause. We have reviewed fifteen of the seventeen challenged rulings and found no trial court error. Accordingly, even if we assume that the trial court erred in denying Appellant's challenges for cause to the two remaining veniremembers at issue, Wiley and Niesman, Appellant cannot show harm. *See id.*

Points of error six and seventeen are overruled.

### IV.  Voir Dire—Remaining Issues

In points of error twenty-two and twenty-three, Appellant argues that by overruling his challenges for cause, the trial court deprived him of a lawfully constituted jury under the federal and state constitutions and Article 35.16.  However, Appellant has failed to show that the trial court erred in its rulings about the complained-of jurors or that he suffered harm as a result.  *See Gray v. State*, 233 S.W.3d 295, 301 (Tex. Crim. App. 2007).  Absent such a showing, we presume that the jurors who served on Appellant's jury were qualified.  *See id.*  Because Appellant has not overcome this presumption, he is not entitled to relief.  *See id.* at 301–02.  Points of error twenty-two and twenty-three are overruled.

## V.  Hearsay

In points of error twenty-six through twenty-eight, which are briefed collectively, Appellant contends that the trial court erred in overruling his hearsay objections to testimony given by Jennifer Escobar, Moses Martinez, and Crystal Cortes about statements Brenda Delgado made to them while planning Hatcher's murder.

The trial court overruled Appellant's hearsay objections after the prosecution argued that the testimony was not hearsay because it was statements of co-conspirators or was admissible under the statements-against-interest exception to the hearsay rule.  *See* Tex. R. Evid. 801(e)(2), 803(24).  Appellant does not explain why either of those bases for admission were erroneous but makes a conclusory assertion that the testimony was hearsay.  Accordingly, he has inadequately briefed points of error twenty-six, twenty-seven, and twenty-eight.  *See* Tex. R. App. P. 38.1(i); *Linney v. State*, 413 S.W.3d 766,

767-68 (Tex. Crim. App. 2013) (stating that appellant's conclusory argument that merely "recited the elements of his stated grounds for relief" fell "far short of satisfying his obligation to adequately discuss" his claim). Nevertheless, we address the merits of his claims in the interest of justice.

A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *Colone v. State*, 573 S.W.3d 249, 263–64 (Tex. Crim. App. 2019). The trial court's ruling will be upheld if it is within the zone of reasonable disagreement. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). If the trial court's evidentiary ruling is correct under any applicable theory of law, an appellate court should not disturb it, even if the trial court gave a wrong or insufficient reason for the ruling. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016).

## V.A. Escobar's Testimony

Escobar was Delgado's friend and former roommate. Escobar testified that while they were roommates Delgado had approached her about harming Hatcher, which she initially agreed to before deciding she did not want to be involved. Escobar's complained-of testimony began with this exchange with the prosecutor:

> Q. Okay. Now, Jennifer, at some point Brenda brings you into a plan that she has involving a woman by the name of Kendra Hatcher?
>
> A. Yes, sir.
>
> Q. And what was that plan?

The trial court sustained a hearsay objection by the defense, but the prosecutor asked to approach the bench. After an off-the-record bench conference the questioning resumed:

> Q. (BY [PROSECUTOR]) Jennifer, let me ask you again. Now, at some point Brenda reaches out to you and asks you to help do something?
>
> A. Yes, sir.
>
> Q. And she offers you money to do that?
>
> A. Yes, sir. She offers –
>
> Q. How -- how much money did she offer you?

Defense counsel interrupted before Escobar could answer. Referencing "the conversation we had at the sidebar," he said he wanted to renew his hearsay objection in the presence of the jury. The trial court overruled the objection, and questioning continued:

> Q. (BY [PROSECUTOR]) What did she -- what did she offer you?
>
> A. She offers [sic] me $2,000, plus a car.
>
> Q. And for $2,000 and a car, what were you supposed to do?

At this point, defense counsel asked to approach the bench. After another off-the-record bench conference, the trial court excused the jury from the courtroom. Defense counsel then made a record of what had transpired during the off-the-record bench conferences: the trial court had initially sustained his hearsay objection, but at the first bench conference, the prosecutor had offered a hearsay exception which caused the trial

court to change its ruling. Counsel asked to formalize the basis for the trial court's ruling for purposes of appellate review.

The prosecution argued Delgado's statements were admissible as statements against penal interest made by an indicted co-conspirator and in furtherance of a conspiracy. The trial court granted the defense a running hearsay objection to oral statements made by indicted co-conspirators but ruled that such testimony was admissible. The jury re-entered the courtroom and the State's questioning resumed:

> Q.  (BY [PROSECUTOR]) Okay. Ms. Escobar, I think where we left off was I had asked you what you were supposed to do for -- in exchange for $2,000 and a car.
>
> A.  She -- she had several plans. First, it was Ricky. Put him in a coma or beat him up, or just eliminate Hatcher.
>
> Q.  Did she describe to you how she wanted either of those things to happen?
>
> A.  For -- for Ricky, she had bought a bat, some type of needle. I don't know what -- what it contained, basically for him -- to put him to sleep. She wanted to capture -- to follow around Hatcher and basically eliminate her. She had so many -- so many ways of -- one was going to her car. Basically whenever she would get in her car, grab her from the front and just stab her with the needle that I'm describing. Two, just go and beat her up.

## V.B.  Martinez's Testimony

Moses Martinez was Delgado's cousin. Martinez testified that Delgado had approached him about help in harming Hatcher, but he had refused. Martinez's complained-of testimony began with the following exchange:

> Q.  Had [Delgado] talked to you about Dr. Ricardo Paniagua?
>
> A.  Yes.

Q.      Had she talked to you about how they had broken up?

A.      Yes, sir.

Q.      Okay. Had she talked to you about how she wanted to get back at him?

A.      Yes, sir.

Q.      Did she make any reference or talk to you at all about wanting -- at least starting off, to hurt Dr. Paniagua?

A.      Yes.

The trial court overruled a hearsay objection, and Martinez's direct examination

resumed:

Q.      (BY [PROSECUTOR]) You can answer the question. Did she make any -- say anything to you about wanting to hurt Ricky?

A.      Yes, she said that. But when she was talking like that, she was -- she was drinking at the time. Every time I see her, she was just -- she was not in her right mind. She was just -- every time we see her, like she was just drunk. She was just drinking a lot. I don't know because of what was going on, but she was always -- she wasn't there.

Q.      Okay. But she would have conversations with you about doing things like that, and then at some point did those conversations turn to hurting a girl named Kendra?

A.      Yes.

Q.      Okay. Now, did she ever talk to you specifically about how she wanted you to do it?

A.      She just said she wanted me to hit her with the --with the bat. And that's when I told her I didn't want to do that, like it's not worth it. It's someone innocent. I told my uncles, and that's when we stopped talking because they didn't believe me.

\*    \*    \*

Q.     Okay. Now, you mentioned a bat. She had said something about a bat to you. What does this appear to be to you?

A.     It's a bat.

Q.     It's a bat? Do you know if she had already bought a bat when she was talking to you about this?

A.     Yes.

Q.     And that would be -- I just showed you State's Exhibit 136.

A.     Yes, sir.

Q.     So you made -- you made the decision that what she's asking you is not a good idea?

A.     Yes.

Q.     Did she offer you help with your child support?

A.     She offered me money.

Q.     And she offered you money?

A.     I told her I wouldn't do it for money, for nothing.

Q.     What about a car? Did she offer to help you with a car?

A.     Offered me a car.

## V.C. Cortes's Testimony

Appellant complains of the following exchange between Cortes and the

prosecutor:

Q.     Now, at some point Brenda starts talking to you about someone named Kendra Hatcher?

A.     Yes.

Q.     Okay. What kinds of things is she talking to you about?

A.     She said that Kendra Hatcher –

[Hearsay objection sustained and then overruled]
Q.     (BY [PROSECUTOR]) You can answer.

A.     Okay. She said that Kendra Hatcher, she hated her, she didn't want anything to do with her. She already knew where Kendra lived. She pretty much said she wanted to do away with Kendra.

## V.D.  Analysis

"'Hearsay' means a statement that:  (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted."  Tex. R. Evid. 801(d).  Hearsay is generally inadmissible except as provided by statute or by the Texas Rules of Evidence.  Tex. R. Evid. 802.

A statement that "was made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay.  Tex. R. Evid. 801(e)(2)(E).  A statement against interest may be admitted as an exception to the hearsay rule:

(24) Statement Against Interest.  A statement that:

  (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability or to make the declarant an object of hatred, ridicule, or disgrace; and

  (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Tex. R. Evid. 803(24).

The trial court did not abuse its discretion in admitting the testimony of Escobar, Martinez, or Cortes about Delgado's statements because their testimony was admissible under Rule 803(24).  The underlying "statements" attributed to Delgado through these three witnesses' testimony met Rule 803(24)'s exception to the hearsay prohibition.

Rule 803(24) establishes

> a two-step foundation requirement for admissibility. First, the trial court must determine whether the statement, considering all the circumstances, subjects the declarant to criminal liability and whether the declarant realized this when he made that statement. Second, the court must determine whether there are sufficient corroborating circumstances that clearly indicate the trustworthiness of the statement.

*Walter v. State*, 267 S.W.3d 883, 890–91 (Tex. Crim. App. 2008) (internal footnotes omitted).  In determining whether there are sufficient corroborating circumstances, a trial court should consider a number of factors:  (1) whether the declarant's guilt is inconsistent with the defendant's guilt, (2) whether the declarant was so situated that she might have committed the crime, (3) the declaration's timing, (4) the declaration's spontaneity, (5) the relationship between the declarant and the party to whom the statement is made, and (6) the existence of independent corroborative facts.  *Dewberry v. State*, 4 S.W.3d 735, 751 (Tex. Crim. App. 1999).  "When the statement is offered by the State to inculpate the defendant, as in the case before us, the first two factors are not relevant."  *Woods v. State*, 152 S.W.3d 105, 113 (Tex. Crim. App. 2004).

Here the statements attributed to Delgado were against her penal interest, as they potentially subjected her to criminal liability for criminal solicitation or attempted capital

murder for remuneration, among other offenses. *See* Tex. Penal Code §§ 15.03, 19.03(a)(3). In addition, Delgado undoubtedly would have realized that hiring or attempting to hire others to commit murder on her behalf would subject her to criminal penalties.

Further, the statements attributed to Delgado bore sufficient indicia of trustworthiness. Delgado made the unprompted statements well in advance of the offense, as she was attempting to recruit someone to help her commit Hatcher's murder. *See Woods*, 152 S.W.3d at 113 (stating that the timing and spontaneity of statements against interest tend to establish their reliability). Delgado also made these statements to Escobar and Cortes, her friends, and Martinez, her cousin. *See Walter*, 267 S.W.3d at 898 (noting that statements to friends, loved ones, or family members normally do not raise the same trustworthiness concerns as those made to persons outside this circle).

Moreover, the State presented abundant independent evidence that corroborated Delgado's statements. Detectives Barnes testified that Delgado had a motive to murder Hatcher—Hatcher was dating Delgado's former boyfriend, Paniagua. Other witnesses testified that Delgado was distraught over her breakup with Paniagua and obsessed with him and his new romantic relationship with Hatcher. Delgado hired Cortes and Appellant to murder Hatcher in exchange for payment, but only after several other people had refused Delgado's offers. Ortiz, the owner of the Jeep used in the offense, testified that Delgado borrowed it on the day of the offense. Delgado told Barnes that Cortes had been driving the Jeep that day. Cortes subsequently told investigators that Hatcher's murder

resulted from a murder-for-hire scheme that Delgado orchestrated. When investigators searched Delgado's car, they found a bat, which Delgado had suggested Escobar and Martinez use in the offense. The *Dewberry* factors plus the foregoing independent corroborative evidence support a finding that Delgado's statements offered through Escobar's, Martinez's, and Cortes's testimony bore sufficient indicia of reliability and were therefore admissible under Rule 803(24).

Because Escobar's, Martinez's, and Cortes's testimony was admissible under Rule 803(24), we need not consider whether it was also admissible as non-hearsay under Rule 801(e)(2)(E).

Points of error twenty-six through twenty-eight are overruled.

## VI.  Suppression Issues

In points of error twenty-nine and thirty Appellant claims that the trial court erred in overruling motions to suppress searches of his car.

In his briefing for point of error twenty-nine, Appellant quotes trial counsel's explanation to the trial court about the issues in his suppression motion, summarizes the suppression hearing testimony, and sets forth some general law about warrantless searches and exigent circumstances. His effort to apply the law to the facts consists of these conclusory sentences:

> The testimony on when a warrantless search in this case was conducted is contradicted by the fact that a large number of law enforcement officers both police and FBI agents were present where the vehicle was stopped. The trial court denied Appellant a fair trial by denying the motion to suppress. The only fair [remedy] is to remand for a new trial.

In his briefing for point of error thirty, Appellant directs us to the objections trial counsel made to the warrant. Appellant then states,

> Trial counsel explained the factual basis of his objections at Reporter's Record Volume 36 p. 59 and why the trial court abused its discretion in overruling his motion to suppress any evidence related to the search of the vehicle, mainly the recovery of a firearm later tied to the murder.

The totality of Appellant's argument on appeal is:

> Appellant submits that the underlying affidavit of the warrant is insufficient as argued by trial counsel to the trial court. The seized evidence should have been suppressed based on either of trial counsel's two theories of suppression based on an illegal search of the vehicle.

> In point of error twenty-nine, Appellant has insufficiently applied the law to facts.

In point of error of thirty, he has entirely failed to do so. These two points of error are inadequately briefed, and we will not address them. *See* Tex. R. App. P. 38.1(i); *Wolfe v. State*, 509 S.W.3d 325, 342–43 (Tex. Crim. App. 2017).

> Points of error twenty-nine and thirty are overruled.

## VII. Victim Impact Evidence

In point of error thirty-one Appellant claims that the trial court erred at the punishment phase "in overruling [his] objection concerning victim impact evidence." The claim apparently pertains to an objection trial counsel made when the State indicated that it would call Hatcher's mother to rebut Appellant's mitigation case.

The objection at trial was that it would be improper for the State to "have the last word" because the State can't present victim impact evidence "unless the Defendant has failed to waive his right to – to present mitigating evidence." *See Williams v. State*, 273

S.W.3d 200, 225 (Tex. Crim. App. 2008) (concluding that the mitigation special issue is a waivable defensive issue). The argument on appeal is that "in total the State's victim impact character evidence [sic] was so voluminous that it violated Appellant's right to due process and a fair trial" and thus the trial court erred to overrule the relevance objection. Appellant failed to preserve the claim he raises on appeal because it does not comport with his objection at trial. *See* Tex. R. App. P. 33.1; *Bekendam v. State*, 441 S.W.3d 295, 300 (Tex. Crim. App. 2014) ("We are not hyper-technical in examination of whether error was preserved, but the point of error on appeal must comport with the objection made at trial.").

This point is also inadequately briefed. Appellant provides some general law on victim impact testimony and quotes at length from *Mosley* but fails to apply the law to the facts. He asserts that the total volume of victim impact or victim character evidence presented by the State violated his constitutional rights to due process and a fair trial. But he does not identify where in the record or through what witnesses, other than Hatcher's mother, the State presented such victim impact or victim character evidence. *See Wolfe*, 509 S.W.3d at 342–43; Tex. R. App. P. 38.1(i).

Point of error thirty-one is overruled.

**VIII. Photographs**

In points of error thirty-two and thirty-three Appellant complains about the admission of photographs in the punishment phase of trial. Neither point is adequately briefed.

"A photograph is generally admissible if verbal testimony about the matters depicted in the photograph is also admissible." *Young v. State*, 283 S.W.3d 854, 875 (Tex. Crim. App. 2009). Further, victim impact and victim character evidence are generally admissible at the punishment phase of a capital murder trial. *See Williams*, 273 S.W.3d at 218–19. "[G]iving the defendant 'the broadest latitude to introduce relevant mitigating evidence,' as has been done under Supreme Court precedent, justly entails permitting the prosecutor to introduce 'the human costs of the crime of which the defendant stands convicted.'" *Id*. (quoting *Payne v. Tennessee*, 501 U.S. 808, 827 (1991)).

## VIII.A. "Victim-Impact" Photographs

In point of error thirty-two, Appellant contends that the trial court erred in overruling his objection to "victim-impact" photographs. Appellant refers us to trial counsel's argument where he objected to the admission of fifteen photographs of Hatcher, State's Exhibits SX-363-374 and SX-376-380, taken at various points during her life. Trial counsel argued that the photographs were "duplicitous" and redundant and referred to guilt-phase testimony about Hatcher. Appellant argues that the "sheer volume" of the photographs made them unduly prejudicial.

However, Appellant has not explained how the fifteen photographs created an undue prejudice by their volume nor shown how they were duplicative of guilt–innocence testimony; instead, he conclusorily asserts that the photographs are excessively

voluminous without applying the law to the facts. He thus has failed to adequately brief the argument. Tex. R. App. P. 38.1(i).

Point of error thirty-two is overruled.

## VIII.B. Photographs of Appellant

In point of error thirty-three Appellant asserts that the trial court erred to admit State's Exhibits 176 and 178, photographs of him which he contends are prejudicial. The two images are from Appellant's cell phone. State's Exhibit 176 shows his face and various chest tattoos. State's Exhibit 178 is a close-up of Appellant grimacing.

Trial counsel objected to State's Exhibit 178 on the grounds that it had no probative value and that anything depicted in it was prejudicial. Trial counsel also asserted that State's Exhibit 176 was "duplicitous" because it could accomplish the same goal as State's Exhibit 178 by "bring[ing] forth a depiction of [Appellant] with a . . . grimace upon his face." The trial court overruled the objection.

Appellant now contends that the exhibits at issue were inadmissible under Rule 403 because their probative value was substantially outweighed by the risk of unfair prejudice or because they were needlessly cumulative. *See* Tex. R. Evid. 403. He sets forth, without citation to any authority, a list of factors that he says a court may consider in determining whether a photograph's probative value is substantially outweighed by the danger of unfair prejudice. He does not apply any of these factors to his case. Instead, he concludes that the probative value of the photographs was

outweighed by their prejudicial effect or the needless presentation of cumulative evidence, and thus the trial court abused its discretion in admitting the photographs.

The point is inadequately briefed. *See* Tex. R. App. P. 38.1(i); *Wolfe*, 509 S.W.3d at 342–43.

Point of error thirty-three is overruled.

## IX.  Punishment Charge

In point of error thirty-six Appellant asserts approximately thirty-three challenges to the trial court's punishment charge.  He acknowledges that our precedents foreclose his requested instructions and objections to the trial court's punishment charge but states that he seeks to preserve the issues for potential federal review.  He also asks us to reconsider our precedents, but provides no argument for doing so.

The point of error is multifarious and inadequately briefed.  *See Davis*, 329 S.W.3d at 803; Tex. R. App. P. 38.1(i).  We see no reason to reconsider our precedents.

Point of error thirty-six is overruled.

## X.  Constitutional Challenges to Article 37.071

In points of error thirty-nine through forty-six, Appellant raises various constitutional challenges to Article 37.071.  Citing *Saldano v. State*, 232 S.W.3d 77 (Tex. Crim. App. 2007), Appellant acknowledges that we have previously considered and rejected each of the arguments that he raises.  He explains that he submits the points of error to preserve them for federal review and to invite us to review our prior decisions.

Appellant is correct that we have previously rejected the arguments he asserts in points of error thirty-nine through forty-six.  *See, e.g.*, *Coble*, 330 S.W.3d at 296–98.  He does not persuade us to revisit our holdings.

Points of error thirty-nine through forty-six are overruled.

We affirm the trial court's judgment and sentence of death.

Delivered: April 14, 2021

Do not publish